United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 23, 2003**

Charles R. Fulbruge III
Clerk

Revised July 31, 2003

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

02-30659

_____

CARL FRUGE, on behalf of Casey Fruge; DARLA MONK FRUGE, on behalf
of Casey Fruge; DERRICK FRUGE

Plaintiffs-Appellants,

VERSUS

PARKER DRILLING COMPANY, ET AL

Defendants,

ANADARKO PETROLEUM CORPORATION; STOKES & SPIEHLER USA
INCORPORATED; GREG ZIELINSKI INCORPORATED,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Western District of Louisiana

_____

Before DUHÉ, EMILIO M. GARZA and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

In this suit involving personal injuries on a drilling platform on the outer continental shelf off the coast of Louisiana, the district court granted summary judgment to the platform owner and two independent contractors whom the owner had hired to monitor the drilling operation. Holding as a matter of law that Appellees are not subject to strict liability, are not guilty of negligence,

nor responsible for the negligent acts, if any, of the drilling contractor (another independent contractor not appearing in this appeal), or for loss of evidence, we affirm.

## I.

Defendant-Appellee Anadarko Petroleum Corporation ("Anadarko") as principal contracted with Parker Drilling Offshore Corporation ("Parker") as drilling contractor to complete a well on Anadarko's stationary platform. Plaintiff's employer, M-I, LLC, was under contract with Anadarko to provide filtration services for the project. Plaintiff-Appellant Carl Fruge was operating a filter unit on the platform when a discharge hose which was part of Parker's rig ruptured and injured him.

The ruptured hose was not produced for examination despite Plaintiff's demands. The hose is lost. The on-site supervisors saw the ruptured hose at the time of the accident and several times after the accident. Those supervisors were employees of Defendants-Appellees Stokes & Spiehler USA, Inc., and Greg Zielinski, Inc., with whom Anadarko had contracted to provide company men for on-the-job supervision.

Fruge sued Parker, Anadarko, Stokes & Spiehler, and Zielinski, among others. Anadarko, Stokes & Spiehler, and Zielinski moved for summary judgment on the basis that they were not negligent and did not exercise operational control over Parker's drilling operations so bore no responsibility for Parker's alleged negligence.

The district court granted all three motions. Fruge's claims

2

against Parker remain in the district court.[1]

This Court reviews grants of summary judgment *de novo*, applying the same standard as the district court, viewing the evidence in a light most favorable to the non-movant. <u>Coulter v. Texaco</u>, 117 F.3d 909, 911 (5th Cir. 1997); <u>Coleman v. Houston Indep. Sch. Dist.</u>, 113 F.3d 528, 533 (5th Cir. 1997).

## II.

Federal jurisdiction is predicated on the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.* OCSLA adopts the law of the adjacent state (Louisiana) as surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations. <u>Bartholomew v. CNG Producing Co.</u>, 832 F.2d 326, 328 (5th Cir. 1987); 43 U.S.C. § 1333(a)(2)(A). Thus the law applicable is "federal law, supplemented by state law of the adjacent state." <u>Rodrigue v. Aetna Cas. & Sur. Co.</u>, 395 U.S. 352, 355, 89 S. Ct. 1835, 1837, 23 L. Ed. 2d 360 (1969).

Bearing in mind these principles, we are first asked to determine whether federal regulations create civil liability beyond the liability under state law as enunciated in <u>Coulter v. Texaco</u>. Applying Louisiana negligence law, <u>Coulter</u> held that a principal is not liable for the actions of its independent contractor unless the

---

[1] Appellate jurisdiction is appropriate, as Fruge noticed appeals from judgments certified as final under Fed. R. Civ. P. 54(b). We agree with the parties that the timeliness of the appeal under 28 U.S.C. § 1292(a)(3) is not at issue, because this case does not arise under admiralty jurisdiction.

principal retained "operational control" over the contractor's work (discussed <u>infra</u>) or expressly or impliedly approved its unsafe work practice that led to an injury. <u>Coulter</u>, 117 F.3d at 912.

Fruge argues that <u>Coulter</u> is not an appropriate precedent because it did not deal with federal Minerals Management Service ("MMS") regulations enacted after <u>Coulter</u>. Those regulations, according to Plaintiff, place primary responsibility on the mineral lessee (Anadarko) and its agents (Zielinski and Stokes & Spiehler) for supervising the operations and maintaining safety over the operations and equipment — without any regard to "operational control" or authorization of an unsafe work practice. If a mineral lessee establishes that it did not maintain operational control, according to Fruge, it has necessarily violated the federal regulations, creating liability as a matter of law. The key regulation, in Plaintiff's view, charges that the lessee, the operator, and the person actually performing the activity "are jointly and severally responsible" for complying with the offshore MMS regulations. 30 C.F.R. § 250.146(a)&(c). This regulation further allows the Regional Supervisor to require any or all co-lessees to fulfill obligations under the regulations or the lease, if the designated operator fails to fulfill obligations under the regulations. <u>Id.</u> § 146(b).[2]

---

[2]  The regulation provides as follows:
**§ 250.146 Who is responsible for fulfilling leasehold obligations?**
    (a) When you are not the sole lessee, you and your

4

The MMS regulations in place at the time of <u>Coulter</u> similarly carried the concept of responsibility on the parts of both the lessee and the operator for obligations under the lease and the regulations.[3]  The Secretary has considered the law to have provided for joint and several liability of co-lessees and the operator since the enactment of OCSLA (1953) and the common law,

co-lessee(s) are jointly and severally responsible for fulfilling your obligations under the provisions of 30 CFR parts 250 through 282, unless otherwise provided in these regulations.
     (b) If your designated operator fails to fulfill any of your obligations under 30 CFR parts 250 through 282, the Regional Supervisor may require you or any or all of your co-lessees to fulfill those obligations or other operational obligations under the [OCSLA], the lease, or the regulations.
     (c) Whenever the regulations in 30 CFR parts 250 through 282 require the lessee to meet a requirement or perform an action, the lessee, operator (if one has been designated), and the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation.
30 C.F.R. § 250.146 (2002)(eff. Jan. 27, 2000, 64 Fed. Reg. 72,756 (Dec. 28. 1999)).

[3]  July 29, 1997, was the decision date of <u>Coulter</u>. The MMS regulations at that time provided,
     **§ 250.8 Designation of operator.**
     In all cases *where operations are not conducted by an exclusive owner* of record, a *designation of operator* shall be submitted to the Regional Supervisor prior to the commencement of operations. This designation *will be accepted as authority for the operator*, or the operator's local representative, *to act on behalf of the lessee and to fulfill the lessee's obligations under the Act and the regulations in this part.* . . .  In case of a termination [of the authority of the operator] or in the event of a controversy between the lessee and the designated operator, *both the lessee and the operator will be required to protect the interests of the lessor.*
30 C.F.R. § 250.8 (1988)(emphasis added).  This regulation became effective May 31, 1988, 53 Fed. Reg. 10,596 (April 1, 1988), and was superseded August 20, 1997, by § 250.8, *infra* n.4.

through the present date.[4]      Although the regulations

---

[4] The MMS has taken the position, since long before the 1988 regulation quoted in the previous note, that the both lessee and the designated operator are required to bear the non-monetary obligations under the lease as well as any obligations under the regulations. Publishing notice of the superseding regulation (reproduced below) which used the phrase "joint and several" to describe non-monetary lease obligations, the MMS expressed its intention that the regulation simply "*[c]larifie[d] [its] position* that co-lessees and operating rights owners are *jointly and severally liable for compliance with our regulations and the terms and conditions of their* OCS oil and gas and sulphur *lease* for nonmonetary obligations." 62 Fed. Reg. 27,948, 27,948-49 (May 22, 1997) (emphasis added). That "clarifying" regulation provided,

§ 250.8 Designation of operator.
This section explains the requirement for designation of an operator to conduct operations on a lease where the operator is not the sole lessee (record title owner) and owner of operating rights.
(a) Each record title owner (lessee) or operating rights owner for a lease must provide the Regional Supervisor a *designation of operator* in each case where someone other than an exclusive record title and operating rights owner will conduct lease operations. . . .
(1)  *This designation of operator is authority for the operator* to act on behalf of each lessee and operating rights owner and *to fulfill each of their obligations under the Act, the lease, and the regulations in this part.*
. . .
(3) If you terminate a designation of operator or a controversy develops between you and your designated operator, *you and the operator must protect the lessor's interests.*
. . .
(b) *Lessees and operating rights owners are jointly and severally responsible for performing nonmonetary lease obligations*, unless otherwise provided in the regulations in this chapter. *If the designated operator fails to perform any obligation under the lease or the regulations in this chapter, the Regional Director may require any or all of the co-lessees and operating rights owners to bring the lease into compliance.*
30 C.F.R. § 250.8 (1997)(emphasis added)(effective Aug. 20, 1997, 62 Fed. Reg. 27,954 (May 22, 1997), redesignated as 30 C.F.R. § 250.108 effective June 30, 1998, without any change in substance,

63 Fed. Reg. 29,478, 29,479 (May 29, 1998)(renumbering §§ 250.0-250.26 as §§ 250.100-250.126), and superseded Jan. 27, 2002 by 30 C.F.R. § 250.146 (2002), *supra* n.2). Further revealing the MMS's understanding that joint and several liability had been the law since before <u>Coulter</u>, the Federal Register reported the following comment and response relative to proposed § 250.8(a)(1):

> Comment: A trade organization commented that the imposition of joint and several liability should be prospective only because the Secretary has no authority to issue retroactive rules.
>
> Response: *This rule merely codifies what has been the law under the OCSLA, since enactment and the common law.* As previously noted, section 5(a)(2)(C)(II) of the OCSLA describes those who jointly own interests in a lease as "partners."

62 Fed. Reg. 27,948, 27,950 (May 22, 1997)(emphasis added). Announcing the regulation as final, the MMS again demonstrated that it had long held the view that operating rights owners and lessees are jointly and severally responsible for nonmonetary lease obligations as well as obligations to comply with MMS regulations in the following commentary:

> Section 250.8 . . . Since joint and several liability is closely related to the requirement for the designation of an operator, we have consolidated several provisions of the proposed rule in a revised §250.8 . . . . Every lessee or working interest owner who executes the designation of operator required under the provisions of § 250.8, Form MMS-1123, acknowledges its joint and several liability.
>
> Comment: Twelve respondents expressed opposition to, or lack of support for, what they characterized as "the effort to establish joint and several liability between co-lessees or between assignors and assignees of OCS leases."
>
> Response: *This rule simply clarifies our position that nonmonetary lease obligations are joint and several among co-lessees (i.e., multiple lessees) and owners of operating rights.* Section 5(a)(2)(C)(II) of the Outer Continental Shelf Lands Act (OCSLA) equates multiple lessees to "partners."
>
> *Our position on this matter remains the same as it was May 10, 1954, the effective date of the regulations the Department of the Interior (DOI) issued to implement the OCSLA of 1953.* . . .
>
> *As previously noted, each party that executes a designation of operator agreement recognizes the joint and several nature of OCS lease obligations.* The designation of operator (Form MMS-1123) designates the entity that the co-lessees authorize to conduct lease operations as each of the co-lessee's

7

have been modified a number of times, the regulations and commentary manifest the intention to retain this shared liability over the years. Nothing in the 2002 regulations preempts <u>Coulter</u>, and <u>Coulter</u> is therefore still precedent.

Additionally, this Court has held that a violation of the MMS regulations does not give rise to a private cause of action. <u>Romero v. Mobil Exploration & Producing North America, Inc.</u>, 939 F.2d 307, 310-11 (5th Cir. 1991). The regulations govern the parties' joint and several liabilities vis-à-vis the Government,[5] not amongst themselves.[6] This principle also defeats Fruge's

---

"operator and local agent." Each lessee, by execution of the designation of operator, agrees that "In case of default on the part of the designated operator, the signatory lessee will make full and prompt compliance with all regulations, lease terms, or orders of the Secretary of the Interior (Secretary) or his representative."
<u>Id.</u> at 27,949 (emphasis added).

[5] <u>See</u>, <u>e.g.</u>, 62 Fed. Reg. 27,948, 27,950 (discussing 30 C.F.R. § 250.8(a)(1)(eff. Aug. 20, 1997), <u>supra</u> n.4) in which the MMS declared, "While parties to a contract may agree to limit liability, neither Congress nor the Secretary ever agreed to limit the liabilities of OCS lessees for operational obligations."

[6] Fruge also argues that the regulations making the duties joint and several perforce make the duties non-delegable among the private parties. Discussing joint and several liability of § 250.108, the MMS responded to a comment on a related regulation making lessees and owners of operating rights jointly and severally responsible for obligations relating to abandoning well bores (30 C.F.R. § 250.110). In the following exchange, the MMS made clear that the joint and several liability to the MMS for fulfillment of lease obligations does not prevent the parties from parsing out the obligations differently among themselves by contract:
Section 250.110 General requirements. Comment: Two respondents recommended that paragraph (b) of §250.110, General requirements, be changed to clarify the extent of responsibility of prior lessees for obtaining compliance with

8

contention that Anadarko had a duty under the regulations to use the best available and safest technology to test the hose. Under the drilling contract, the obligation to maintain and repair Parker's equipment and to comply with applicable safety regulations rested on Parker's shoulders.[7] The OCSLA regulations do not create an independent duty under Louisiana negligence law. <u>Dupre v. Chevron U.S.A., Inc.</u>, 109 F.3d 230, 231 (5th Cir. 1997). Therefore, we will follow the guidance of <u>Coulter</u> and <u>Romero</u>, finding nothing in the MMS regulations to preempt their application.

## III.

Fruge next argues that, regardless of the MMS regulations, under the <u>Coulter</u> standard, the evidence left a question of fact

---

accrued obligations.
    Response: We have modified the text of this provision to present its contents in easily understood English. While this rule determines *who is liable to MMS for performance of nonmonetary obligations, it is not our intention that this rule preclude private agreements concerning the allocation of liabilities between and among the affected parties.* Nor does this rule specify against whom we will take enforcement action if we discover noncompliance.
62 Fed. Reg. 27,948, 27,949-50 (emphasis added). The Secretary further declared, "MMS has never given its imprimatur to efforts of lessees to limit *their liabilities to MMS*, much less created a property right to such limitations." <u>Id.</u> at 27,950 (emphasis added).

[7] Master Domestic Daywork Drilling Contract § 503(b) (Parker and its personnel to "comply with all applicable federal, state, and local laws, ordinances, rules, regulations, and lease or contract provisions regarding pollution, safety and the environment"); <u>id.</u> § 403 (Parker "responsible for the maintenance and repair" of all its own equipment).

whether Anadarko and its company representatives retained operational control over the work of its independent contractor, Parker. To determine whether the exception for operational control makes a principal liable, we first examine the extent to which Anadarko contractually reserved the right to control the work. Coulter, 117 F.3d at 912.

Under the contract between Parker and Anadarko, Parker was "responsible for the maintenance and repair of all [its own equipment]." Master Domestic Daywork Drilling Contract § 403. Parker also was responsible for the "operation and control of the Drilling Unit," including supervision and having "final authority and responsibility for the safety and operation of all systems and all personnel associated with the drilling operation." Contract § 502(a). When the contract assigns the independent contractor responsibility for its own activities, the principal does not retain operational control. See Coulter, 117 F.3d at 912.

Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way. LeJeune v. Shell Oil Co., 950 F.2d 267-270 (5th Cir. 1992); McCormack v. Noble Drilling Corp., 608 F.2d 169, 175 n.9 (5th Cir. 1979). Here, Parker was exclusively responsible for controlling the details of the work it performed: the contract provided that Parker "shall be an independent contractor with respect to performance of all work hereunder. [Anadarko] shall

10

have *no direction or control* of [Parker] or [Parker's] Personnel except in the results to be obtained." Contract § 105 (emphasis added).

The summary judgment evidence shows Anadarko provided on-site supervision 24-hours per day, via various independent contractors whose employees reported to Anadarko staff engineers on a daily basis. The physical presence of a representative of a principal is not sufficient to show supervision or control. Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, 550-51 (5th Cir. 1987), cert. denied, 485 U.S. 1034, 108 S. Ct. 1593, 99 L. Ed. 2d 908 (1988); Graham v. Amoco Oil Co., 21 F.3d 643, 646 (5th Cir. 1994). Periodic inspections by a principal's "company man" do not equate to that principal retaining control over the operations conducted by a drilling crew. Ainsworth, 828 F.2d at 550. "In short, absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal . . . cannot be liable under the operational control exception." Coulter, 117 F.3d at 912.

Summary judgment is appropriate because Plaintiff has failed to present facts sufficient to distinguish his case from Coulter. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment is appropriate unless plaintiff can present evidence to support each essential element of his claim). "This Court has consistently held on similar facts that a principal, such as [Anadarko], who hires independent

11

contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors." <u>Wallace v. Oceaneering Int'l</u>, 727 F.2d 427, 437 (5th Cir. 1984). On the evidence of record, summary judgment is proper for Anadarko as well as the employers of Anadarko's company men, Zielinski and Stokes & Spiehler, neither of whom are responsible for the alleged negligent acts of an independent contractor of their principal.

IV.

As alternative grounds for liability, Fruge argues that Anadarko or its representatives had custody of the defective hose that caused Fruge's injuries or that the hose was a component part or appurtenance to Anadarko's platform, resulting in custodian or premises liability under the Louisiana Civil Code. Indisputably, Parker provided the hose and Parker employees operated its equipment.

The first requirement for custodial liability under Louisiana Code articles 2317 and 2317.1,[8] is that the "thing" that caused the injury be in the custody of the defendant. Although the owner is

---

[8] Louisiana Civil Code article 2317 provides, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by . . . the things which we have in our custody." Article 2317.1 provides, "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage," if the damage could have been prevented by the exercise of reasonable care.

12

presumed to have custody, a non-owner defendant may have custody over property if "he exercises direction and control of the thing and derives some benefit from it."  Coulter, 117 F.3d at 913 & n. 10.  The mere presence of Anadarko's company man does not create the kind of supervision and control necessary to establish that Anadarko had custody over the Parker rig or the hose that ruptured.  Neither the presence of company men who monitored the contractor's performance nor the limited involvement of engineers "comes anywhere close to creating the kind of supervision and control necessary" to establish the principal's custody over the drilling rig or the hose for purposes of article 2317.  Coulter, 117 F.3d at 914.

As for premises liability under article 2322,[9] a prerequisite to recovery is that Parker's rig "had become an appurtenance to, or integral part of, [Anadarko's] platform by virtue of that rig's physical attachment to that structure."  Coulter, 117 F.3d at 914.  Things are considered a component part of a construction for purposes of assessing premises liability under article 2322 if they are "permanently attached" to a building or other construction within the meaning of article 466.  Coulter, 117 F.3d at 914.

---

[9]    Louisiana Civil Code article 2322 makes the owner of a building "answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction," if he knew or should have known of the vice or defect which caused the damage, and the damage could have been prevented by the exercise of reasonable care.

"Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached."  La. Civ. Code art. 466.

Plaintiff has pointed out no evidence that Parker's rig became a component part of Anadarko's platform.  The only summary judgment evidence is to the contrary — that the rig moved from platform to platform without substantial damage to either the rig or the platform.  As such, we hold as a matter of law that the rig is not an appurtenance for purposes of article 2322.  See Coulter, 117 F.3d at 914-918.

Fruge's theories of recovery under articles 2317, 2317.1, and 2322 therefore fail.

## V.

Fruge finally argues that according to the two cases decided at Marocco v. General Motors Corp., 966 F.2d 220 (7th Cir. 1992), Anadarko should be held liable as a matter of law for loss of the hose.  Those two cases are distinguishable in that each involved violation of a protective order.  See id. at 221.

Here, the hose was lost before the suit was filed, when no such order to preserve evidence had issued.  Moreover, Plaintiff presented no evidence suggesting bad faith on the part of Anadarko.  Accordingly, we discern no error in the district court's decision to dismiss Anadarko despite Plaintiff's arguments regarding spoliation of evidence.

## VI.

14

After a de novo review of the record, we hold that the undisputed facts leave no room for finding liability against Anadarko, Stokes & Speihler, or Zeilinski under the various theories asserted. Under the Anadarko/Parker contract and based on the conduct of the parties, Anadarko and its company representatives did not have operational control over the work performed by Parker. A violation of MMS regulations, even if one occurred, does not give rise to a cause of action. The hose that ruptured was not in the custody of Anadarko or its representatives, at the time of the accident and the rig was not part of Anadarko's platform. We find no error in the decision not to sanction Anadarko for the loss of the hose. The judgment of the district court is

AFFIRMED.