# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
February 17, 2021

Lyle W. Cayce
Clerk

No. 20-30038

Carla Echeverry,

*Plaintiff—Appellee*,

*versus*

Jazz Casino Company, L.L.C., *doing business as* Harrah's New Orleans Casino,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-6494

ON PETITION FOR REHEARING and REHEARING EN BANC

Before Jolly, Southwick, and Wilson, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

The prior opinion is withdrawn.

Carla Echeverry was injured when a manlift struck her outside Harrah's Casino in New Orleans. A jury found Jazz Casino Company negligent, assigning it 49% of the fault. Among the jury awards to Echeverry was $1,000,000 for future pain and suffering. The Casino appeals, seeking review of the district court's denials of the Casino's motion for judgment as

a matter of law, motion for a new trial, and motion for remittitur or a new trial on damages.  We hold that the evidence was sufficient to support the finding of negligence on each of the three theories presented to jurors.  We also hold that none of the objected-to evidence was erroneously admitted at trial.  Conversely, we hold that the jury's $1,000,000 award for future pain, suffering, mental anguish, disability, scarring, and disfigurement was excessive.  We therefore AFFIRM the district court's denial of the Casino's motion for judgment as a matter of law and motion for a new trial, VACATE the $1,000,000 award for future pain and suffering, and REMAND for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Jazz Casino Company, doing business as Harrah's New Orleans Casino, hired Alabama Wildlife Removal ("AWR") as an independent contractor in January 2017 to remove birds from palm trees near the Casino.  On February 16, 2017, during the second week of the project, Echeverry stood near the worksite in front of the Casino as she waited to cross an adjacent street.  AWR was using a manlift to reach the treetops.  As the manlift was being moved from one group of trees to another, it struck Echeverry, running her over and causing a comminuted fracture in her lower right leg and ankle.  The AWR employee serving as the flagman had not alerted Echeverry to the movement of the manlift as he passed her.

Echeverry filed a negligence lawsuit in state court against AWR, its owner Phillip Padgett, manlift operator Richard Tyler, and the Casino.  The Casino removed to federal court.  There, a jury trial was held from August 5–8, 2019.  Echeverry presented three theories of negligence to the jury: negligence in hiring, in operational control, and in authorization of unsafe work practices.

No. 20-30038

The jury found the Casino negligent and assigned it 49% of the fault. Remaining fault was assigned to AWR (50%) and Echeverry herself (1%). The jury awarded damages for (1) past pain, suffering, and mental anguish; (2) past, present, and future loss of enjoyment of life; (3) past medical expenses; (4) past lost wages; (5) loss of college tuition; and, relevant to this appeal, (5) $1,000,000 for future pain, suffering, mental anguish, disability, scarring, and disfigurement.

Only the Casino appeals. It seeks review of the district court's denials of motions for judgment as a matter of law, for a new trial, and for remittitur or a new trial on damages.

## DISCUSSION

On appeal, the Casino raises three issues. First, it argues that the evidence is insufficient to support one or more of Echeverry's theories of negligence and it is therefore entitled to a new trial or judgment as a matter of law. Second, it argues that four items of evidence — the Better Business Bureau ("BBB") rating, the certificate of insurance, the Casino's internal policies, and the construction-site photographs — were erroneously and harmfully admitted into evidence. Finally, it argues that the $1,000,000 award for future pain and suffering violates this court's maximum-recovery rule and entitles the Casino to remittitur or a new trial on damages.

We first discuss the sufficiency of the evidence.

I.    *Sufficiency of the evidence*

We review the denial of a motion for judgment as a matter of law *de novo*, considering the facts in the light that most favors the jury verdict. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016). We cannot reverse a denial of a motion for judgment as a matter of law unless the "jury's factual findings are not supported by substantial

evidence or [] the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *American Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 486–87 (5th Cir. 2004). "Substantial evidence is that relevant evidence — more than a scintilla but less than a preponderance — that would cause a reasonable person to accept the fact finding." *Coastal Prod. Servs. Inc. v. Hudson*, 555 F.3d 426, 430 (5th Cir. 2009) (quoting *Dir., OWCP v. Ingalls Shipbuilding, Inc.*, 125 F.3d 303, 305 (5th Cir. 1997)).

Echeverry presented three theories of negligence to the jury. When, as here, it is unclear from the verdict which theory of negligence persuaded the jury, a new trial is necessary if the evidence is insufficient on at least one theory but not on all. *Muth v. Ford Motor Co.*, 461 F.3d 557, 564 (5th Cir. 2006). This court employs a harmless-error "gloss," meaning that if we are "totally satisfied" or "reasonably certain" based on the focus of the evidence at trial that the jury's verdict was not based on the theory with insufficient evidence, a new trial is unnecessary. *Id.* at 564–65. If the evidence is insufficient as to each theory, then the defendant is entitled to judgment notwithstanding the verdict. *King v. Ford Motor Co.*, 597 F.2d 436, 439 (5th Cir. 1979).

Under Louisiana law, a principal is generally not liable for the acts of its independent contractor. *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). A principal may, however, be liable if it was independently negligent in its own actions, *id.*, or if it negligently hired the independent contractor, *Hemphill v. State Farm Insurance Co.*, 472 So. 2d 320, 324 (La. Ct. App. 1985). Moreover, exceptions to a principal's shield from liability exist if "the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997).

Echeverry presented evidence of the Casino's negligence under theories of negligent hiring, operational control, and authorization of unsafe work practices. We analyze each theory.

### A.    Negligent hiring

Echeverry presented evidence at trial that the Casino was negligent for hiring an irresponsible independent contractor. As to negligent hiring, the jury was instructed:

> The hiring party breaches its duty if it knew or should have known that the independent contractor was incompetent at the time of the hiring; meaning that the hiring party knew or should have known that the contractor could not perform the job safely or competently.

The district court instructed the jury on a "knew or should have known" standard. The Casino had objected to that standard in its motion for directed verdict, arguing that Louisiana law requires actual knowledge to support a negligent-hiring claim. A panel of this court once stated that Louisiana law on this point was ambiguous. *See Dragna v. KLLM Transp. Servs., L.L.C.*, 638 F. App'x 314, 319 (5th Cir. 2016). We did not resolve the ambiguity because the plaintiffs had not raised a genuine dispute of material fact under either standard. *Id.* The issue is properly presented today.

When we must "make an *Erie* guess, it is not our role to create or modify state law, rather only to predict it." *Lawrence v. Va. Ins. Reciprocal*, 979 F.2d 1053, 1055 (5th Cir. 1992). There is no Louisiana Supreme Court decision on whether actual or constructive knowledge is required to support a claim for negligently hiring an independent contractor. Thus, we review the relevant courts of appeal decisions to determine whether they provide a reliable basis on which to predict state law.

Two decisions by intermediate appellate courts are inconclusive but provide some support that constructive knowledge is sufficient. The

appellate court in each identified the plaintiffs' argument as being that the principal "knew or should have known" at the time of hiring of the subcontractor's inadequacies, but there is no suggestion that the defendant argued for an actual-knowledge standard. *See Hemphill*, 472 So. 2d at 324; *Certified Cleaning & Restoration, Inc. v. Lafayette Ins. Co.*, 67 So. 3d 1277, 1282 (La. Ct. App. 2011).

The Casino finds support for an actual-knowledge requirement in *Guillory v. Conoco, Inc., Continental Oil Co.*, 521 So. 2d 1220, 1224–25 (La. Ct. App. 1988). There, the court affirmed the district court's decision not to instruct the jury on negligent hiring. *Id.* at 1225. Conoco had hired Daniel Construction Company as an independent contractor to build a refinery unit, and Daniel Construction hired a subcontractor. *Id.* at 1222. One of the subcontractor's employees was injured on-site, and the employee brought suit, arguing in part that Conoco was negligent in hiring Daniel Construction. *Id.* The court's full analysis on the negligent-hiring issue was:

> There is no evidence that Conoco knew, at the time it hired Daniel Construction Company, that Daniel was irresponsible. Any negligent conduct of Daniel in allowing the Morgan employees to work without fall protection in violation of the safety regulations occurred after Daniel was hired by Conoco. The Louisiana cases cited by plaintiff to support his contention look to the employer's knowledge at the time of hiring.

*Id.* at 1224–25.

The Casino argues that the "knowledge at the time of hiring" language in this and other cases demonstrates an actual-knowledge requirement. The Casino sees more than we do. The *Guillory* analysis is focused on the timing of the necessary knowledge but not its type — actual or constructive. In *Guillory*, as in the other cases relied upon by the Casino,

the court was not responding to an argument that Louisiana law required actual knowledge or that constructive knowledge was sufficient.[1]

Finding some support for constructive knowledge from these opinions and none for actual knowledge, we now look for general Louisiana principles of negligence and negligent hiring outside of the context of independent contractors.  The source for the right to recover for injury caused by negligence is statutory: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  LA. CIV. CODE art. 2315(A).  The Louisiana Supreme Court has stated that "the foundation of any tort lies within" that statute. *Reynolds v. Bordelon*, 172 So. 3d 589, 595 (La. 2015).  In its seminal negligent-hiring case, that court recognized a municipal employer's duty "to exercise reasonable care in hiring." *Roberts v. Benoit*, 605 So. 2d 1032, 1038 (La. 1991).  In that opinion, the court "expressly recognize[d] the tort of negligent hiring as cognizable under Louisiana fault principles embodied in [article] 2315." *Id.* at 1044.

Also helpful in our analysis is that the state's high court has defined negligence in terms of the reasonableness of a party's conduct:

> All theories of recovery, or categories of tort liability, are "fault" in Louisiana, although they represent different levels of blameworthiness or culpability . . . . [Moving along a spectrum of fault,] one arrives at negligence, *i.e.*, the actor knew or should have known that his conduct presented an unreasonable risk of harm to someone, and he or she failed to act reasonably to avoid that risk.

---

[1] The Casino cites to other cases for the proposition that actual knowledge is required. *See Evans v. Allstate Ins. Co.*, 194 So. 2d 762 (La. Ct. App. 1967); *Perkins v. Gregory Mfg. Co.*, 671 So. 2d 1036 (La. Ct. App. 1996); *Schram v. Colony Specialty Ins. Co.*, No. 16-598, 2016 WL 7475827 (La. Ct. App. Dec. 29, 2016).  None of these courts had the issue of whether the knowledge requirement for negligent hiring imposed an actual or constructive standard, and we do not read any of them as answering that question.

*Reynolds*, 172 So. 3d at 595–96 (quoting FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 1.03 (2004)).

The same treatise that was quoted by the state court has another, helpful explanation: "An actor is negligent if he knows or should know of a risk and fails to exercise reasonable care to avoid or reduce that risk. It is 'the failure to exercise reasonable care under the circumstances.'" FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 1.05 (perm. ed., rev. vol. 2013). We conclude that under these principles, a factfinder is entitled to decide that a potential employer's duty to use reasonable care to reduce a risk may include making further inquiries if the notice it does have of potential problems is suggestive but inconclusive.

Our best guess, then, in the *Erie* sense of course, is that Louisiana law assesses the reasonableness of the principal's actions based not only on what the principal actually knew when it hired an independent contractor, but also relevant is what was reasonable, *i.e.*, what it should have known.[2] Consequently, the district court's instruction was not erroneous.

The parties stipulated that the Casino hired AWR in January 2017, so the relevant question is whether the Casino knew or should have known in January 2017 that AWR was incompetent. The relevant evidence includes that a bird-control company named Bird-X recommended AWR to David Stuart, Director of Business and Process Improvement for the Casino. Stuart

---

[2] We decline to certify the question to the Louisiana Supreme Court because certification is not to be used indiscriminately. "As a general proposition we are chary about certifying questions of law absent a compelling reason to do so; the availability of certification is such an important resource to this court that we will not risk its continued availability by going to that well too often." *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997). In the absence of a decision from the state supreme court, we may use our "best judgment" to make an "*Erie* guess" as to how the state supreme court would resolve the question. *Temple v. McCall*, 720 F.3d 301, 307 (5th Cir. 2013). We find ample authority to resolve the issue ourselves.

contacted some of AWR's references and received no negative information about AWR. The BBB, though, had given AWR an "F" rating. The Casino's internal policies required that before beginning work, an independent contractor had to provide a certificate of insurance with a minimum amount of coverage that identified the Casino as an additional insured. AWR provided a certificate of insurance to the Casino at about the time it began work on the project, February 6–7, 2017, but the identified policy had expired in October 2016.

The Casino argues that none of this evidence is relevant. The "F" rating from the BBB, the Casino points out, was not necessarily a result of safety concerns and could not have put the Casino on notice of safety risks in hiring AWR. At trial, the jury heard that a business's failure to respond to consumer complaints against that business was the most common reason for an "F" rating. There is no evidence that the Casino knew what earned a business an "F" rating when it hired AWR, and the Casino denied knowledge of the rating anyway. The jury, however, could have found that the Casino at least should have known about the rating when hiring AWR. We find that the rating itself is not strong evidence of AWR's ability to complete the project safely or competently, but it is some evidence to support that the Casino should have investigated further before contracting with the company. The BBB rating may reflect more on the Casino's failure to investigate adequately before hiring AWR than it reflects on the competency of AWR. The jury, however, is permitted to make inferences from the evidence. Regardless, the BBB rating is not the only evidence Echeverry presented for the negligent-hiring theory.

Other evidence was that AWR's certificate of insurance showed an expired insurance policy. The Casino's internal policies required that it hire only contractors who were insured. There was evidence at trial that the Casino hired AWR through a purchase request rather than a more formal

contract in order to accelerate the process. Under usual circumstances, the Casino would delay issuing a purchase order until it had received a valid certificate of insurance from the vendor, but that did not occur here. The Casino argues that this evidence does not support negligent hiring because it did not know that AWR was uninsured until after it hired AWR and, regardless, insurance is not probative of safety. Even if the Casino did not learn of AWR's lack of insurance until after it hired AWR, we conclude that jurors could have found that the Casino should have sought to learn earlier. In making such a finding, jurors could have relied in part on testimony from a director in strategic sourcing at Caesars Entertainment, which owns the Casino, who stated in his deposition played at trial that he agreed "that responsible contractors are insured contractors." AWR's failure to conform to the Casino's requirements is itself a kind of incompetency.

Next, there was evidence that AWR did not have its own equipment to use in the bird removal. We do not see this alone as sufficient evidence of incompetence, but it could suggest to factfinders that AWR was not a well-established, substantial, and experienced company. Patrick Maher, Director of Facilities at the Casino, testified at trial that he generally expected contractors to provide their own equipment when he hired them. Jurors could have considered the evidence of AWR's lack of the necessary equipment to support that the Casino should have been concerned about whether AWR was sufficiently experienced to be competent for the work.

There also was evidence that AWR's permit had expired by the time of the accident on February 16, 2017, and that AWR was short-staffed. AWR acquired a valid work permit when it arrived in New Orleans to begin the project, but the project continued after the permit expired. AWR acquired the permit on February 6, 2017; the start date of the permit was that same day, and it had an end date of February 8, 2017. It is difficult to see the relevance of the expired permit to the negligent-hiring claim because the

Casino neither knew nor could have known about its expiration when it hired AWR in January 2017.  The same is true regarding the fact that AWR was short-staffed.  The evidence at trial showed that two AWR employees quit at the beginning of the project, but there was no evidence presented at trial that the Casino knew or should have known in January that AWR would be short-staffed when removing the birds.  Because the Casino neither knew nor could have known about either the expiration of the permit or that AWR was short-staffed at the time it hired AWR in January 2017, these facts are inapplicable to the negligent-hiring analysis.

The BBB rating, the certificate of insurance showing an expired policy, and AWR's lack of equipment together are more than a scintilla of evidence to support a finding that the Casino was negligent in hiring AWR. The evidence is sufficient as to the negligent-hiring claim.

We proceed to the next theory.

### B.     Operational control

A principal may be liable for the actions of its independent contractor if the principal retains operational control.  *Coulter*, 117 F.3d at 911–12. Determining whether a principal has retained operational control requires "an examination of whether and to what extent the right to control work has been contractually reserved by the principal." *Id.* at 912.  The supervision and control that is actually exercised by the principal is less important than the right to control that is contractually reserved. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550–51 (5th Cir. 1987).  Still, a contractual clause requiring an independent contractor to comply with the principal's safety rules does not alone signify the principal's retaining operational control. *Davenport v. Amax Nickel, Inc.*, 569 So. 2d 23, 28 (La. Ct. App. 1990).  The fact that a principal "reserves the right to monitor its contractor's performance[,] . . . observes the contractor's activities, . . . make[s] safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or

No. 20-30038

conditions . . . does not mean that the principal controls the . . . contractor's work." *Coulter*, 117 F.3d at 912. When the independent contractor has "responsibility for its own activities, the principal does not retain operational control." *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003). A principal retains operational control if it has "direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Id.* Whether a principal retains operational control turns on the principal's control over the independent contractor and its employees, not on the principal's control over its own premises. *Collins v. Home Depot, U.S.A., Inc.*, 182 So. 3d 324, 331 (La. Ct. App. 2015).

Echeverry relies on a case from the Fourth Circuit Court of Appeal of Louisiana. There the "company man" performed actual safety checks on the worksite. *Denson v. Diamond Offshore Co.*, 955 So. 2d 730, 733–34 (La. Ct. App. 2007). That court distinguished its facts from those of cases where the company representatives occasionally visited worksites but did not perform safety checks themselves. *Id.* at 734. As the Casino states, the contract at issue in *Denson* explicitly vested several aspects of operational control in the principal. *Id.* at 733. The independent contractor had to "comply with all instructions," including safety instructions, of the principal and was "under the direction and supervision" of the principal. *Id.* Because of the contract language and the fact that the company representative performed safety checks at the jobsite, there was a genuine issue of material fact as to who had operational control. *Id.* at 734. The court reversed the trial court's grant of summary judgment. *Id.* at 733, 735.

Conversely, this court affirmed a district court's grant of summary judgment on the claim of operational-control negligence when the principal did not have direct supervision over the step-by-step processes of the independent contractor's work. *Fruge*, 337 F.3d at 564, 566. In *Fruge*, the

12

contract between Anadarko and its independent contractor, Parker Drilling, made Parker responsible for the "operation and control of the Drilling Unit." *Id.* at 564. "Anadarko provided on-site supervision 24-hours per day, via various independent contractors whose employees reported to Anadarko." *Id.* The court held that physical presence of the principal was not enough to raise a genuine dispute of material fact as to who had operational control, and summary judgment for the defendant was appropriate. *Id.* at 564–65.

Here, there was no written agreement between the parties, so the level of control was not formalized. The jury had some evidence that the Casino maintained operational control over AWR. The Casino provided all the equipment to AWR for the bird-removal project: a manlift, barricades, and a dumpster. It also provided groundskeepers to clean up the sidewalks. Its employee David Stuart attended safety meetings with AWR regarding the safety precautions for the project. He had signs made to direct pedestrians. He would check on the project and lend a hand when he was available to do so, directing pedestrians and trying to keep people safe.

This evidence was sufficient for the jury to find the Casino liable for Echeverry's injury under an operational-control theory.

### C. *Authorization of unsafe work practices*

A principal may be held liable for the unsafe practices of an independent contractor if the principal "expressly or impliedly authorized the *particular manner* which will render the work unsafe." *Davis v. Dynamic Offshore Res., L.L.C.*, 865 F.3d 235, 236 (5th Cir. 2017) (quoting *Ewell v. Petro Processors of La., Inc.*, 364 So. 2d 604, 606–07 (La. Ct. App. 1978)). A company man's observing and failing to object to the independent contractor's unsafe work practices is insufficient evidence of authorization to defeat a motion for summary judgment. *Graham*, 21 F.3d at 646–47. The fact that only an independent contractor participated in the decision to use the negligent procedure weighs heavily against finding that the principal

authorized the unsafe work practice. *Id.* (interpreting *Williams v. Gervais F. Favrot Co.*, 499 So. 2d 623 (La. Ct. App. 1986)).

The threshold question of this theory of negligence is whether the particular manner in which the work practice was conducted was unsafe. This analysis requires determining at what level of generality to view the work practice. We have provided some clarity on this issue under Louisiana law. *See Davis*, 865 F.3d at 236–37. In *Davis*, we held that, based on those facts, the exception to a principal's shield from liability did not apply. *Id.* at 237. Davis was a crane mechanic employed by Gulf Crane Services, which was hired as an independent contractor by Dynamic Offshore Resources. *Id.* at 235. On the relevant day, Davis was obtaining a winch from Dynamic Platform 86A to transfer to Platform 86B so that he could replace a winch there. *Id.* at 235–36. While at Platform 86B, Davis grew concerned about the safety of the work because of the wind, so he used his "stop work authority" to delay the work. *Id.* at 236. Rather than radio those at Platform 86A to inform them to stop, he asked the crane operator to transport him to Platform 86A in a personnel basket. *Id.* The operator swung the basket into the wind when he should have swung it with the wind. *Id.* Davis dropped six to eight feet in the basket and was injured. *Id.*

The court reviewed the district court's summary judgment for Dynamic, analyzing whether there was a genuine dispute of material fact as to the question of implied authorization of unsafe work practices. *Id.* The court framed the particular manner of the practice as making a personnel-basket transfer in high winds. *Id.* at 237. In doing so, the court could have but did not frame the unsafe work practice as making personnel-basket transfers generally or making personnel-basket transfers by swinging into instead of with the wind. *See id.* Rather than a highly specific or general frame, that court chose the one in the middle. In *Davis*, the court held that

No. 20-30038

Dynamic as a matter of law had not authorized the personal-basket transfer in high winds and affirmed summary judgment. *Id.*

Here, the Casino offers a broad framing of the work practice as being the use of a flagman to move a manlift. It argues that because using a flagman to move a manlift is the industry standard, Echeverry's claim fails the threshold requirement that the work practice be unsafe before even addressing whether the Casino authorized it. Alternatively, the Casino frames the practice narrowly as the failure of the flagman to make an effective warning to pedestrians in the path of the manlift; the Casino is correct that it did not authorize that particular manner of using a flagman. Our evaluation of *Davis* makes us conclude that the relevant practice needs to start with the underlying action of using a manlift, then add some specifics of the occasion of its use — here, moving a manlift against vehicular traffic at a busy intersection when there was substantial pedestrian traffic. There was evidence that the flagman did not alert Echeverry, and indeed just walked past her despite the imminent passage of the manlift. Jurors had sufficient evidence to support the conclusion that the particular manner in which the manlift was moved was unsafe.

There was an unsafe work practice, but there must also be evidence that the Casino expressly or impliedly authorized that unsafe practice. Again, according to Louisiana law, a company man's presence and knowledge of an unsafe condition is insufficient to make the company liable under the implied-authorization exception. *Graham*, 21 F.3d at 646–47. In *Graham*, we interpreted a Louisiana case as holding that the principal was not liable under this exception because "only the [independent contractors] participated in the decision to use [the negligent] procedure." *Id.* at 646 (bracketed insertions in original) (quoting *Williams*, 499 So. 2d at 626).

Unlike in *Graham*, the Casino here did participate in the decision to use a flagman. Casino employee Stuart attended safety meetings with AWR

15

to discuss the practices that would be used, including using a flagman. The Casino provided AWR with the manlift. The Casino was also trying to expedite the project so that it could be completed before Mardi Gras and the NBA All-Star game, designating the purchase order as "urgency: emergency." The evidence was sufficient for a reasonable jury to conclude that the Casino had authorized unsafe work practices.

There is sufficient evidence under each theory of negligence. Next, we analyze whether the Casino is entitled to a new trial due to errors in the admission of evidence.

## II.    *Admission of evidence at trial*

Prior to the trial, the Casino sought to exclude certain categories of evidence, including (1) a certificate of insurance given by AWR to the Casino showing an expired insurance policy; (2) the Casino's internal policies regarding hiring independent contractors; (3) AWR's "F" rating from the BBB; and (4) photographic evidence of construction sites in New Orleans. The district court denied the motion *in limine* as to the first two categories of evidence. It granted in part and denied in part the motion to exclude evidence from the BBB, but the jury was allowed to hear testimony regarding AWR's "F" rating from the BBB. The district court initially granted the Casino's motion to exclude photographic evidence of construction sites but then allowed the photographs at trial.

For a new trial to be warranted based on admission of evidence, the admission must have been an abuse of the district court's discretion and have affected the substantial rights of the complaining party. *Price v. Rosiek Constr. Co.*, 509 F.3d 704, 707 (5th Cir. 2007). When a party fails to show that excluding the evidence would have altered the outcome of the case, the party has not met its burden for a new trial. *Id.* at 707–08. For example, a party's substantial rights are affected if the erroneously admitted evidence was the

only evidence admitted to prove an element. *See Anderson v. Siemens Corp.*, 335 F.3d 466, 473–75 (5th Cir. 2003).

The Casino claims that four types of evidence were erroneously and harmfully admitted at trial. We examine them one at a time.

### A.     *AWR's "F" rating by the BBB*

The Casino argues the district court abused its discretion by admitting evidence of AWR's "F" rating by the BBB. At trial, the evidence showed that the BBB relies entirely on complaints about a business and any supporting evidence provided in those complaints for its ratings. Depending on the business size, a company can be automatically rated "F" after two complaints are made against it without a response from the business. The BBB does not investigate the safety of work practices of a business beyond publicly available information. All this means the BBB evidence is not very probative of the safety and competency of AWR. Still, as we earlier discussed, it might have been properly used by jurors as evidence of the Casino's failure to investigate AWR adequately. Regardless, the district court has "great discretion" in admitting evidence that has any tendency to make any material fact more or less probable. *See Woods ex rel. Woods v. Int'l Harvester Co., Inc.*, 697 F.2d 635, 639 (5th Cir. 1983); Fed. R. Evid. 401. The evidence of the BBB rating at least added to the jurors' understanding that the Casino missed another of the markers that could have led to further inquiry, even if the inquiry would not have led to much of significance. We find no abuse of the district court's discretion by admitting this evidence.

### B.     *AWR's certificate of insurance*

The Casino argues that the district court's admission of evidence of AWR's expired certificate of insurance entitles it to a new trial. The Casino relies on Federal Rule of Evidence 411, which makes inadmissible the existence or nonexistence of insurance for purposes of proving or disproving

a party's negligence. FED. R. EVID. 411. Evidence of insurance is admissible for certain relevant purposes. *Id.* Here, AWR's lack of insurance was not admitted on the issue of *AWR's negligence* but to prove *the Casino's negligence* in hiring AWR. Rule 411 was not violated.

The Casino also argues that the insurance evidence is irrelevant to its negligence because whether AWR had a certificate of insurance identifying its current policy at the time of hiring had no bearing on AWR's safety or competence. The bar for relevant evidence is low; the evidence needs to have only "any tendency" to make a fact in question more or less likely. FED. R. EVID. 401(a). A district court is given great deference in this determination. The district court did not abuse its discretion, and we do not need to reach the question of harmlessness.

### C.     *The Casino's internal policies*

The Casino argues that the district court abused its discretion by admitting the Casino's internal policies into evidence. The Casino relies on *Dragna*, 638 F. App'x at 320, for this proposition. While *Dragna*, which is not precedent, held that internal policies did not establish the applicable standard of care, that panel did not go so far as to say that evidence that a principal violated its internal policies is irrelevant to the question of negligence. *Id.* We conclude that failure to follow internal policies can be relevant. The district court did not abuse its discretion by admitting the evidence.

### D.     *Construction-site photographs*

The district court granted the Casino's motion *in limine* to exclude photographic evidence of construction sites because Echeverry was injured at a bird-removal site, not a construction site. At trial, though, the Casino's expert witness was impeached with his deposition testimony that the bird-removal site where Echeverry was injured closely resembled a construction

site.  Because of that statement, the district court allowed the photographs of New Orleans construction sites to be introduced at trial.

The district court did not abuse its discretion by admitting the evidence of construction sites.  Echeverry sought to use the evidence of construction sites that had barricades to show that there should have been barricades in place to prevent her injury.  The fact that the bird-removal site did not have barricades when similar construction sites did is some evidence of a breach of the applicable standard of care, especially when the Casino's expert made the comparison to construction sites.  The Casino was allowed to present evidence that tended to justify why there were no barricades, and the jury weighed the evidence.

A new trial was not required based on erroneous admission of evidence.

## III.    *Excessive damages for future pain and suffering*

We review the denial of a motion for a new trial or remittitur in the alternative for abuse of discretion.  *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 296 & n.9 (5th Cir. 2019).  We have generally used the maximum-recovery rule, which "permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision"; we have recently identified this court's inconsistencies concerning the stage of the inquiry at which we apply it and to what extent it applies in diversity-jurisdiction cases.  *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019).  We have sometimes applied the maximum-recovery rule "at the outset to determine whether the damages are excessive," and other times "only to determine how much of a reduction is warranted after deciding the award is excessive."  *Id.*  In *Longoria*, we suggested that the correct process in a diversity-jurisdiction case may be to use state law to determine whether the damages are excessive and the maximum-recovery rule in setting remittitur.  *Id.* at 366.  In that case,

though, we did not definitively resolve the question because the outcome was the same under the state or federal standard. *Id.* The same is true here.

Under Louisiana law, a court should reduce a jury's award when it is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." *Youn v. Mar. Overseas Corp.*, 623 So. 2d 1257, 1261 (La. 1993). Louisiana law would not look to "prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion" in its award to the particular plaintiff under the particular facts of a case. *Id.* at 1260. After a Louisiana appellate court has determined that the award was an abuse of discretion, it may then look to prior awards to determine the highest reasonable award. *Id.* Under the maximum-recovery rule, we will uphold a damages award where the damages amount is proportionate to at least one factually similar, published Louisiana case. *See Longoria*, 932 F.3d at 365. We refuse to overturn jury awards that are within 150% of the highest award in a factually similar case. *Puga*, 922 F.3d at 297. This rule preserves as much of the jury's award as possible. *Longoria*, 932 F.3d at 365.

Here, the award was excessive under either standard. Echeverry had three surgeries to repair her ankle injuries. She had a trimalleolar fracture, involving breaks to her lateral malleolus, medial malleolus, and posterior malleolus. The fracture was comminuted, meaning that her ankle was in pieces. Echeverry's ankle already shows signs of post-traumatic arthritis. She will have chronic, "toothache"-like pain for the rest of her life, as well as scarring. Further, part of her cartilage is permanently damaged. Echeverry returned to work in January 2018 as a pharmacy technician, standing for about eight hours a day, and had her third surgery in August 2018. She takes over-the-counter pain medication throughout the workday to help with her pain. At the time of trial, she was 33 years old and had no physical restrictions

from doctors. An expert at trial testified that Echeverry's life expectancy was 52.2 years. The million-dollar award for future pain and suffering under these particular circumstances is "beyond that which a reasonable trier of fact could assess" based on Echeverry's injuries. *See Youn*, 623 So. 2d at 1261.

We also assess the future-pain-and-suffering award under the maximum-recovery rule to determine whether it is excessive under that rule. This analysis will also serve as the second step under Louisiana law — determining the highest reasonable award. The district court, in applying the maximum-recovery rule, relied on the damages award in an unpublished decision that was later vacated and remanded for a new trial on damages for allowing irrelevant and prejudicial evidence. *See Naquin v. Elevating Boats, LLC*, No. 10-4320, 2012 WL 5618503 (E.D. La. Nov. 15, 2012), *aff'd in part, vacated in part, remanded Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927 (5th Cir. 2014). This court has declined to rely on unpublished opinions for the maximum-recovery rule. *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002). *Naquin* is thus not a good comparison for the maximum-recovery rule, even before considering the factual differences between that case and Echeverry's.

Several published Louisiana cases provide insight. We acknowledge that inflation will affect comparison of the monetary amounts. In one case, the plaintiff's injuries included a "comminuted fracture with medial dislocation of the right talus (ankle joint), a comminuted fracture of the medial malleolus of the right ankle, and a chip fracture of the medial aspect of the lateral malleolus of the right ankle." *Black v. Ebasco Servs., Inc.*, 411 So. 2d 1159, 1161–62 (La. Ct. App. 1982). He had surgery on his ankle to insert two metal screws and two pins. *Id.* He was still under medical treatment at the time of trial and neither the screws nor pins had been removed. *Id.* at 1161. The trial judge there did not itemize the damages but

awarded $167,000 for pain and suffering, future medical expenses, and loss of past and future wages, plus $3,922.53 for medical expenses. *Id.* at 1161, 1164. Finding that the district court abused its discretion by awarding an insufficient sum, the Louisiana court of appeal concluded that a reasonable award for past and future pain and suffering would be $40,000. *Id.* at 1164. Considering that and reasonable damages for other damage categories, the court raised the total award to $249,922.53. *Id.* at 1165.

In another case, the plaintiff suffered a trimalleolar fracture of her right ankle. *Hebert v. Veterans Veterinary Hosp., Inc.*, 694 So. 2d 993, 996 (La. Ct. App. 1997). Her bones were fused in surgery with screws and plates, and a second surgery was performed to remove the screws and plates. *Id.* She had scarring and arthritis in her ankle, the possibility of future surgery, and nonsurgical medical treatment for the rest of her life. *Id.* The jury awarded her $165,000 for past and future pain and suffering, disability, and scarring. *Id.* Her life expectancy at the time of trial was 17.9 years. *Id.* The Louisiana appellate court held that "the award is on the high side" but did not hold that it was an abuse of discretion. *Id.* at 997. Even accounting for inflation, the difference in life expectancies between Echeverry and the plaintiff in *Hebert*, and the 50% enhancement, the award on the "high side" there shows how excessive Echeverry's million-dollar award is.

Finally, in another Louisiana case the plaintiff sustained what the opinion called "a fractured dislocation of her ankle," requiring two surgeries. *Kennedy v. Columbus Am. Props., L.L.C.*, 751 So. 2d 369, 370 (La. Ct. App. 2000). The evidence at trial suggested that she might require more surgery in the future. *Id.* at 374. She had scarring from the surgeries, and she had led an active lifestyle prior to the accident. *Id.* She also had degenerative arthritis. *Id.* The jury awarded her $220,000 in general damages. *Id.* at 370. The Louisiana court of appeal noted that "$220,000 seems to be at the high end of the range," but ultimately held the judgment reasonable. *Id.* at 374.

These cases demonstrate the excessiveness of Echeverry's $1,000,000 award for future pain and suffering and provide guidance for what the highest reasonable award is. Even adjusted for inflation and with the 50% enhancement, Echeverry's award is far greater than factually similar cases. The district court abused its discretion by denying the Casino's motion for a new trial on damages or remittitur.

\* \* \*

The evidence was sufficient to support the jury's negligence verdict on each of three theories presented to it. The district court did not abuse its discretion by admitting any of the objected-to evidence. The award for future pain and suffering, though, was excessive.

We VACATE the jury's $1,000,000 award for future pain, suffering, mental anguish, disability, scarring, and disfigurement as excessive and REMAND for a new trial on damages or a remittitur determination in light of the factually similar cases we have cited and others that might be brought to the district court's attention. The petition for rehearing is DENIED.[3]

---

[3] Because no member of this panel nor judge in regular active service on the court requested that the court be polled on Rehearing *En Banc*, (FED. R. APP. P. and 5TH CIR. R. 35) the Petition for Rehearing *En Banc* is also DENIED.