# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 28, 2025

Lyle W. Cayce
Clerk

No. 23-30755

Anika Warner, *as guardian of minor child*, Y. J.,

*Plaintiff—Appellee*,

*versus*

Talos ERT, L.L.C.,

*Defendant—Appellant*,

---

Vantrece Jackson,

*Plaintiff—Appellee*,

*versus*

Talos ERT, L.L.C.,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC Nos. 2:18-CV-1435, 2:19-CV-44

---

Before CLEMENT, GRAVES, and RAMIREZ, *Circuit Judges*.

IRMA CARRILLO RAMIREZ, *Circuit Judge*:

Talos ERT, L.L.C. (Talos) appeals a jury verdict in favor of the son and wife of a worker who was killed on one of its oil-and-gas platforms. We AFFIRM the verdict and the damages awarded to the worker's son, VACATE the general damages awarded to his wife, and REMAND for remittitur.

## I

### A

Talos hired DLS, L.L.C. (DLS) to remove the corroded piping from an oil-and-gas platform in the Outer Continental Shelf off of the Louisiana coast. DLS employees who were removing corroded piping running along the bottom of the platform's cellar deck used a rope to lower a 129-pound pipe to the "plus ten deck"[1] approximately 40 feet below. The rope broke, and the pipe fell and hit Walter Jackson (Jackson), a DLS employee working on the plus ten deck. He died from his injuries.

Jackson's widow, Vantrece Jackson (Mrs. Jackson), and Jackson's son, Y.J., by and through his mother, Anika Warner (collectively, Plaintiffs), separately sued Talos for wrongful death, and the suits were consolidated.[2] The case went to trial before a jury on January 25, 2023.

### 1

The jury heard that Talos and DLS executed a Master Service Agreement (MSA), which stated the parties' general rights and obligations

---

[1] The "plus ten deck" is located approximately ten feet above water level.

[2] The plaintiffs also sued Diverse Safety and Scaffolding, LLC, but it was later dismissed from the suit.

to each other and required the execution of a "SEMS Bridging Agreement."[3] In the SEMS Bridging Agreement, the parties agreed that while working on the platform, DLS would use Talos's safety forms, and follow Talos's safety manual, SEMS program, as well as "the safe work practices as communicated by [Talos]," rather than DLS's own.[4]

Talos and DLS planned the corrosion removal project. A DLS superintendent, Stephen DeLue, visited the platform, determined the personnel and equipment that would be needed to complete the project, compiled a list or "dummy ticket," and sent it for approval to a Talos facility engineer, Larry Robinson. DLS's corporate representative, Joseph Tortomase, testified that every piece of equipment had to be reviewed, approved, and paid for by Talos. In his view, Talos and DLS "had [an] equal share of responsibility" over the planning process. But ultimately, Talos had the authority to reject the equipment chosen by the DLS superintendent and instruct that other equipment be used. Talos approved and paid for all of the equipment used on the corrosion removal project.

2

The jury heard about Talos's SEMS program, safety manual, and Job Safety Analysis (JSA) form. A JSA form is used to identify and mitigate

---

[3] The Bureau of Safety and Environmental Enforcement (BSEE) requires that oil companies create a safety program for their platforms, called the Safety and Environmental Management System (SEMS). *See* 30 C.F.R. § 250.1900. Because an oil company's and a contractor's SEMS programs might differ, the parties must execute "an agreement on appropriate contractor safety and environmental policies and practices before the contractor begins work at [the oil company's] facilities," often called a bridging agreement. *Id*. § 250.1914.

[4] Alternatively, the SEMS Bridging Agreement allowed DLS to use its own safety form so long as it met Talos's "minimum criteria," but only Talos's safety manual and forms were used during the corrosion removal project.

potential hazards associated with the scheduled work. The JSA must separately list every step of the scheduled work, potential hazards associated with each step, and control measures to eliminate or mitigate that risk. For example, if simultaneous operations (SIMOPS) were occurring on the platform, the JSA had to ensure that one task did not create a hazard for the workers completing another.

Plaintiffs' industry expert witness, Edward Ziegler, testified that under Talos's safety policies, a contractor may initiate and participate in the hazard assessment process, but work cannot begin on a Talos platform until the JSA is approved by the Person-In-Charge (PIC)—the person who is responsible for the overall safety of the platform.

Before the PIC can approve the JSA, he must physically examine the jobsite, evaluate each step of the work, inspect the equipment, determine that it is appropriate for the job, and issue the requisite permits.

Permits are required for "hot work," which is any task that generates flames, sparks, or heat, like welding, burning, and torch cutting. Hot work cannot be performed unless the PIC issues a hot work permit after evaluating the related hazards (i.e., the risk of sparks falling onto people or onto flammable material), mitigating those hazards, and restricting any potentially dangerous areas on the platform. According to the DLS representative, this process prevents a contractor from conducting any hot work without the PIC's express approval. Likewise, a "barricade entry permit" is required when a worker needs access to a restricted area on the platform. Issuance of this permit also requires that the PIC examine the circumstances, identify any hazards, and create a plan for a safe entry. A separate permit is required for every entry into a restricted area, including same-day re-entries. Copies of these permits must be attached to the JSA, posted at the work site, and must remain on file for two years.

No. 23-30755

Once the PIC has conducted a hazard analysis, issued permits, and determined that it is safe to proceed, he must sign the JSA and review it with the work crew. At this point, the "JSA form becomes the master control document for all authorized work" on a Talos platform. Only then could work begin.

3

On February 17, 2018, the DLS superintendent completed the JSA and conducted a JSA safety meeting with the DLS crew. He testified that he instructed the crew to cut a hole into the pipe to install a shackle and connect the shackle to a manilla rope with a nylon strap. The pipe would then be cut with a cutting torch, rigged onto a pulley system, and lowered to the plus ten deck. The superintendent warned the crew not to cut and lower at the same time, and not to enter the barricaded area until the pipe "hit the deck." The PIC for the corrosion removal project, Jeremy Bourque, a Talos employee with Ultimate Work Authority (UWA),[5] attended the meeting and approved the JSA. The superintendent did not see the PIC evaluate the jobsite that morning.

At approximately 10:00 a.m., a DLS worker was preparing to lower a four-foot-long pipe. He rigged the pipe to a new manilla rope, wrapped the manilla rope around the scaffolding rail, and yelled down to the plus ten deck as he kicked the pipe off the scaffolding. At the same time, another DLS employee began torch-cutting on the cellar deck, causing "sparks and molten and fire" to rain down on the plus ten deck. Jackson, who was working on the plus ten deck, moved to avoid the falling sparks just as the manilla rope broke and the pipe fell, hitting him.

_____

[5] In addition to a PIC, Talos also vests one person with the UWA to make final decisions relating to operations on a platform.

5

No. 23-30755

The BSEE, Talos, and DLS[6] separately investigated Jackson's death.[7]

4

The jury heard that the PIC failed to conduct a proper hazard assessment on February 17, 2018. Evidence showed that he failed to examine the worksite, evaluate the equipment, identify potentially hazardous areas, or discuss potential hazards with the DLS crew. The JSA failed to mitigate the hazards associated with the SIMOPS—simultaneous cutting and lowering—conducted on the platform. Plaintiffs' expert testified that the PIC could have implemented controls to prevent Jackson's injury, like physically separating the tasks[8] or placing an additional crew member on the deck to supervise while pipes were lowered.

The jury heard that the PIC failed to issue a hot work permit on the day of the incident, which would have required him to consider the risk of sparks falling onto the plus ten deck and SIMOPS-related risks. "Slag" and "sparks" fell onto the plus ten deck because the PIC failed to mitigate the hazards resulting from torch cutting, i.e., the hot work.

According to Talos's corporate representative, Rope Spinks, a hot work permit was issued on the day of the incident, but it flew into the Gulf of Mexico during the chaos following Jackson's injury. This information had not been shared with Plaintiffs at any point before trial. Over Talos's

---

[6] The DLS representative testified that he asked to be a part of Talos's investigatory team, but Talos did not allow it. The jury heard that Talos had a lawyer participate in the investigation.

[7] During trial, it was revealed that Talos took witness statements during the course of its investigation that were not turned over to Plaintiffs before trial.

[8] Plaintiffs' expert explained that the PIC could have required that the pipe be lowered from one end of the cellar deck and cut on the opposite end, for example.

objection, the jury heard that Talos had previously been convicted of a felony relating to its failure to issue a hot work permit. Talos's corporate representative had been hired by Talos to "improve Talos's safety culture" after the company had been put on a performance compliance plan for hot work permitting issues.

Plaintiffs presented evidence that the corroded pipe was lowered to an unsafe area on the plus ten deck. The center of the plus ten deck had been barricaded on two sides before the corrosion removal project began because its handrails required repairs. Not only did the barricades fail to properly restrict entry into this area, but the JSA required Jackson to enter the barricaded area to retrieve the pipes from the deck. No barricade entry permit was issued, and the JSA failed to designate any safe "landing zones" or "no-standing zones" on the platform.

The superintendent testified that the piping was lowered into the center of the plus ten deck because it would not block walkways or emergency exists behind the barricades. At that time, he did not know that a barricade entry permit was required to access the area. The PIC did not tell him.

According to Plaintiffs' expert, had the PIC properly considered the barricade entry permit, he would have examined the overhead hazards presented by both the hot work being conducted on the cellar deck and the pipes being lowered onto the plus ten deck. The expert concluded that a permit could not have been issued under the circumstances imposed by the JSA. The plus ten deck should have been, and could have been, effectively restricted so that workers could only access it in under controlled and supervised conditions. In his opinion, the PIC's failure to eliminate SIMOPS hazards, issue a hot work permit, and restrict the plus ten deck caused Jackson's death.

Plaintiffs presented evidence that Talos—through the platform's PIC vested with UWA—had final say over how the work was conducted on the platform on February 17, 2018. The DLS corporate representative testified that Talos and DLS had "equal responsibility" to ensure that the corrosion removal project could be completed safely. Talos and DLS were a team, but Talos was the "team member with the final say."[9]

5

Y.J. and his mother testified about his relationship with Jackson. She testified that the couple made "diligent efforts to coparent," and she never felt like a single parent because "[they] did it together." Y.J. and his mother are life-long Brooklyn residents; Jackson lived in Houston when he and Y.J.'s mother met. Y.J. visited his father "at least every year depending on how old [Y.J.] was," and Jackson visited Y.J. in New York once.

Y.J., who was eight years old when Jackson died, testified that Jackson was "a piece of [him] but the older version." They shared a love of football. Although they lived in different states, they would watch football games together "on video conference, video chat, or on the phone." Jackson and Y.J. would talk "in the morning and the afternoon and at night" and say their prayers together, "if not every day, every other day."

When Jackson died, Y.J. lost his "confidante." According to his mother, Y.J. changed after his father's death. "He was angry. He was sad.

---

[9] During trial, the DLS superintendent admitted that he was a "[l]ittle bit" nervous about testifying because contractors "always" get blamed when something serious occurs on a platform, and "[his] work [could] be affected." DLS's corporate representative stated that he was "uncomfortable" because, in the past, oil companies have expected the contractor to take the blame when something has gone wrong in the course of the work, and a contractor's livelihood depends on oil companies.

He didn't want to do his school work [sic]." Y.J. began seeing a therapist after his father's death.

Jackson's wife of three years testified that he was a loving husband. The couple enjoyed visiting New Orleans, eating at Cheddar's, going to the movies, and attending church together; they were best friends. Jackson would call Mrs. Jackson three times a day when he was offshore "without fail." She did not receive any kind of medical treatment or counseling after his death.

B

After both sides rested, Talos moved for a judgment as a matter of law (JMOL), challenging the sufficiency of the evidence, and it objected to the jury charge and verdict form. The district court denied the motion and overruled the objections.

The jury returned a verdict in favor of Plaintiffs; it allocated fault between Talos and DLS, finding that Talos was 88% at fault for Jackson's death. The jury awarded Y.J. a total of $120,000 in special damages ($40,000 for loss of past financial support and $80,000 for loss of future financial support) and a total of $20,000,000 in general damages ($10,000,000 for loss of love, affection, and companionship; $5,000,000 for past mental anguish; and $5,000,000 for future mental anguish). The jury awarded Mrs. Jackson a total of $987,930 in special damages ($186,407 for loss of past wages; $568,266 for loss of future wages; and $233,257 for loss of household services) and a total of $6,600,000 in general damages ($4,000,000 for loss of love, affection, and companionship; $1,500,000 for past mental anguish; and $1,100,000 in future mental anguish).

Talos filed a renewed JMOL motion, and alternatively moved for a new trial on liability and damages, or a remittitur. After a hearing, the court denied the renewed motion for JMOL and motion for a new trial but granted

the remittitur in part, finding that the general damages awards were excessive for both plaintiffs. It ordered that Y.J.'s total general damages be adjusted from $20,000,000.00 to $4,360,708.59, and that Mrs. Jackson's total general damages be adjusted from $6,600,000.00 to $5,104,226.22, unless Plaintiffs requested a new trial as to general damages. Plaintiffs declined to request a new trial on damages.

Talos appeals the denial of its motion for JMOL and alternative motion for a new trial, and the remittitur.

## II

The Outer Continental Shelf Lands Act asserts "exclusive Federal jurisdiction" over the Outer Continental Shelf and grants subject matter jurisdiction to federal district courts. 43 U.S.C. §§ 1333(a)(1)(A), 1349(b). In doing so, it adopts the laws of the adjacent states when "they are applicable and not inconsistent with" federal law. *Id.* § 1333(a)(2)(A). Because the platform was located off the Louisiana coast, "we will adopt Louisiana law 'as surrogate federal law,'" and apply Louisiana vicarious liability and negligence law. *Coleman v. BP Expl. & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021) (emphasis omitted) (quoting *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969)).

## III

Talos first challenges the denial of its renewed motion for JMOL. The denial of a motion for JMOL is reviewed *de novo. Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, 930 F.3d 647, 652–53 (5th Cir. 2019). This court is generally "wary of upsetting jury verdicts." *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011) (quoting *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481 (5th Cir. 2008)). We are "especially deferential" to them. *Apache Deepwater*, 930 F.3d at 653 (citation omitted). Talos is entitled to JMOL if "a reasonable jury would not have a

legally sufficient evidentiary basis to find for" Plaintiffs. Fed. R. Civ. P. 50(a)(1). The jury's factual findings must be supported by substantial evidence; that is, "relevant evidence—more than a scintilla but less than a preponderance—that would cause a reasonable person to accept the fact finding." *Echeverry v. Jazz Casino Co., L.L.C.*, 988 F.3d 221, 228 (5th Cir. 2021) (en banc) (citation omitted). "In evaluating the evidence, [we] 'credit the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Apache Deepwater*, 930 F.3d at 653 (original alterations omitted).

Where "it is unclear from the verdict which theory of negligence persuaded the jury, a new trial is necessary if the evidence is insufficient on at least one theory but not on all." *Echeverry*, 988 F.3d at 228. We "employ[] a harmless-error 'gloss,' meaning that if we are 'totally satisfied' or 'reasonably certain' based on the focus of the evidence at trial that the jury's verdict was not based on the theory with insufficient evidence, a new trial is unnecessary." *Id*. Talos "is entitled to judgment notwithstanding the verdict" only "[i]f the evidence is insufficient as to each theory." *Id*.

Plaintiffs presented two theories of Talos's liability to the jury: vicarious liability and independent negligence. Talos challenges the sufficiency of the evidence as to both theories.

A

Talos argues that Plaintiffs did not prove an exception to the rule that a principal cannot be held vicariously liable for the negligence of an independent contractor.

"Louisiana law provides the general rule that a principal is not liable for the negligent acts of an independent contractor acting pursuant to the contract." *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). This rule has several exceptions, one of which is relevant to this appeal: A principal

may be liable for an independent contractor's negligence if it expressly or impliedly authorized the unsafe work practices.[10] *Coleman*, 19 F.4th at 731.

Under the unsafe-work-practices exception,

> Where an available safe method, which includes the taking of adequate precautions, will render it at least ordinarily safe, and the work is done in an unsafe manner, the employer will be liable if he has expressly or impliedly authorized the particular manner which will render the work unsafe, and not otherwise.

*Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 329 (5th Cir. 1987) (quoting *Ewell v. Petro Processors of La., Inc.*, 364 So. 2d 604, 606–07 (La. Ct. App. 1978)).

To ascertain "whether the *particular manner* in which the work practice was conducted was unsafe," we must determine "at what level of generality to view the work practice." *Echeverry*, 998 F.3d at 233 (emphasis added). Rather than characterizing the work practice in a "highly specific" or overly "general" manner, we have opted for something "in the middle" of the spectrum. *Id.* at 234. For this evaluation, we start with the underlying action, which generally "track[s] the instrumentality that caused [the] injury[,] . . . not the work's overall purpose," then we add the "specifics of the occasion," which "focus[] on what specifically made the underlying

---

[10] Additionally, a principal may be held vicariously liable for the negligent acts of its independent contractor if the liability arises from an ultrahazardous activity, or it retains operational control over the contractor's actions. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549–50 (5th Cir. 1987). On appeal, Talos argues that the issue of ultrahazardous activity should not have been submitted to the jury. But as the district court repeatedly admonished, it was not. Plaintiffs did not argue this theory at trial, nor was the jury instructed that it could find Talos liable under this exception. Talos also argues that Plaintiffs failed to establish its liability under the operational control exception. But Plaintiffs did not present this argument to the jury either. Because neither theory was presented at trial, we decline to address Talos's arguments.

action unsafe." *Coleman*, 19 F.4th at 731–32 (quoting *Echeverry*, 988 F.3d at 234). Evidence must show that the principal expressly or impliedly authorized the unsafe work practice. *Echeverry*, 988 F.3d at 234.

The instrumentalities that caused Jackson's injury were the manilla rope and the 129-pound pipe; the underlying action was lowering the pipe with the manilla rope. According to Plaintiffs' evidence, the act of lowering the pipe was made unsafe because it was done while Jackson worked directly below. The jury heard that the PIC could have taken adequate precautions to render this task safe, like issuing barricade entry and hot work permits, or restricting access to the plus ten deck on the JSA.

Talos contends that it did not authorize DLS to lower the pipe with a manilla rope while people were working directly below. Instead, the DLS superintendent neglected his supervisory duties and allowed DLS employees to defy his instructions by simultaneously cutting and lowering the pipe, entering the barricaded area while pipe was being lowered overhead, and pushing or kicking the pipe off the scaffolding. But the evidence showed that the PIC approved a JSA that failed to designate any safe "landing zones" or "no-standing zones" on the platform and instead, *required* Jackson to enter the plus ten deck while work was being conducted overhead. Notably, the jury heard that work could not begin on the platform until the PIC — a Talos employee — approved the JSA.

Next, Talos argues that it was DLS's decision to use a manilla rope in the first place, and although Talos agreed with the decision, it insists that its agreement does not constitute approval. As noted, Talos may be liable for DLS's negligence if it expressly or impliedly authorized an unsafe work *practice*. *Coleman*, 19 F.4th at 731. Here, that practice was lowering pipe with a manilla rope while Jackson worked directly below. Whether Talos authorized the use of a specific instrumentality alone is not dispositive.

Nevertheless, the jury heard that Talos approved the equipment list, paid for the rope, and that it had the power to demand that another tool be used if it so desired.

By signing the JSA, the PIC authorized DLS workers to lower pipe from the cellar deck while Jackson worked directly below. The jury heard sufficient evidence to find that Talos authorized the unsafe work practice that led to Jackson's death.

B

Talos also argues that Plaintiffs did not establish that it had a legal duty to ensure the safety of DLS's employees or that it assumed one.

Notwithstanding the general rule that an independent contractor's negligence cannot be imputed onto a principal, a "principal remains liable for its own acts of negligence." *Graham*, 21 F.3d at 645. A principal normally has no duty to affirmatively ensure the safety of its independent contractors. *See id.* at 647. A principal may assume such a duty by contract or by "'voluntarily and affirmatively' go[ing] beyond the contract." *Coleman*, 19 F.4th at 733 (quoting *Graham*, 21 F.3d at 648). "Duty is a question of law." *Graham*, 21 F.3d at 647.

Here, Talos and DLS executed two contracts: the MSA and the SEMS Bridging Agreement. Testimony established that under those contracts, the parties agreed that Talos's safety manual, safety program, and JSA would apply to the corrosion removal project. The safety policies outlined in those documents vested the PIC with the (1) responsibility to conduct a hazard assessment, (2) exclusive authority to issue barricade entry permits and hot work permits, (3) exclusive authority to approve a JSA, and (4) final say on whether the scheduled work can begin subject only to his determination that it is safe to proceed.

No. 23-30755

We have previously applied Louisiana law to nearly identical facts. In *Graham*, an oil rig worker was injured when his employer was hired as an independent contractor for an oil company. *Id.* at 644. The plaintiffs argued that under the oil company's safety manual, certain practices followed by the independent contractor were unsafe, so the oil company's "'company man' had the authority and obligation to stop the operation and correct the . . . problem." *Id.* at 647–48. We held that a company's safety manual cannot "impose extracontractual standards" on an oil company where "[t]he contract never adopted [the company's] safety manual." *Id.* at 648.

In contrast to *Graham*, Talos's safety manual is incorporated into the SEMS Bridging Agreement, which is incorporated into the MSA. That manual required the PIC to identify the hazards Jackson would face on the platform and mitigate them. The jury heard that he failed to do that. The jury was presented with sufficient evidence to find that, under the contracts executed by the parties, Talos assumed a duty to ensure the safety of DLS's workers pursuant to the safety procedures outlined in its SEMS program and safety manual. *See Coleman*, 19 F.4th at 733–34 (noting that in the assumption of duty analysis, "the injury must be caused by induced reliance on the principal's safety rules").[11]

---

[11] In its reply brief, Talos argues for the first time that there is a third contract between the parties under which it did not assume a duty of care. The true contract, Talos contends, was formed when DLS submitted its proposal for the project, Talos accepted the offer, and "[t]he MSA and the Bridging Agreement were then incorporated into that contract." Because Talos did not raise this issue before the district court, this argument is forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal.").

Because the evidence is sufficient to support both theories of liability that Plaintiffs presented at trial, the district court did not err by denying Talos's renewed motion for JMOL.

## IV

Talos next challenges the denial of its motion for a new trial on liability and damages. The denial of a Rule 59 motion for a new trial is reviewed for abuse of discretion. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1049 (5th Cir. 1998). "[O]ur standard of review here is even more deferential than our review of the denial of a motion for [JMOL]." *Id.* When reviewing the denial of a motion for new trial, "all the factors that govern our review . . . favor affirmance, and we must affirm the verdict unless the evidence—viewed in the light most favorable to the jury's verdict—points so strongly . . . in favor of one party that . . . reasonable men could not arrive at a contrary conclusion." *Holmes v. Reddoch*, 117 F.4th 309, 319 (5th Cir. 2024) (citation omitted).

"Where a damage award is excessive or so large as to appear contrary to right reason, the award is generally subject to remittitur, not a new trial." *Marcel v. Placid Oil Co.*, 11 F.3d 563, 568 (5th Cir. 1994). If the "trial court has ordered a remittitur, the standard of review is strict." *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991). In that case, "the trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge." *Id.* "When a jury verdict results from 'passion or prejudice,' a new trial is the proper remedy," however. *Hale v. Wood Grp. PSN, Inc.*, 769 F. App'x 113, 115 (5th Cir. 2019) (per curiam) (quoting *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683 (5th Cir. 1986)).

## A

Talos argues that the district court abused its discretion when it denied Talos's motion for a new trial on liability based on the jury's

No. 23-30755

assessment that Talos was 88% at fault because DLS's corporate representative testified to having "equal responsibility" for ensuring that the corrosion removal project could be completed safely.

As noted, our review of a motion for a new trial is more deferential than that of a JMOL motion. *Hidden Oaks*, 138 F.3d at 1049. Because the verdict is supported by the evidence under both theories of negligence presented by Plaintiffs, the district court did not abuse its discretion by denying Talos's motion for a new trial on liability. *See id.* (finding no abuse of discretion due to previous holding that the district court had correctly denied the motion for JMOL); *Hiltgen v. Sumrall*, 47 F.3d 695, 703 (5th Cir. 1995) ("Since we have already held that the jury's verdict was supported by the evidence, we do not find an abuse of discretion.").

B

Citing *Croce v. Bromley*, 623 F.2d 1084 (5th Cir. 1980), Talos argues that the jury verdict form impermissibly invited duplicate awards for loss of love and mental anguish.[12] It contends this error was compounded when the district court instructed the jury to consider mental anguish and loss of love as separate elements of recovery, and requests a new trial on damages.

---

[12] The parties dispute the applicable standard of review. Talos argues that *de novo* review is appropriate because the district court committed legal error by departing from *Croce*, while Plaintiffs argue that an abuse of discretion standard applies. As noted, we review the denial of a motion for a new trial or remittitur for abuse of discretion. *Seidman*, 923 F.2d at 1140; *see also Puga v. RCX Sols., Inc.*, 922 F.3d 285, 296 (5th Cir. 2019) (collecting cases). This "standard does not preclude an appellate court's correction of a district court's legal or factual error." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (citation omitted).

In *Croce*, a jury awarded the plaintiffs "$20,000 for loss of 'love, affection, counsel, and guidance,'" and "$20,000 for 'sorrow, mental anguish, or grief'" for the wrongful death of a family member. 623 F.2d at 1094. We held that "Louisiana law does not sanction such 'double recovery,'" explaining that "no case . . . stands for the proposition that plaintiffs in a wrongful death action can recover separate monetary awards for loss of love and affection on the one hand and for sorrow and mental anguish on the other." *Id*. at 1094–95 (footnote omitted). We declined to affirm the awards "[a]bsent a clear expression from the Louisiana courts favoring separate monetary awards for distinct elements of nonpecuniary damages." *Id*. at 1095.

Talos asserts that *Croce* is binding here. "When interpreting Louisiana law, we are bound by this court's prior interpretation, so long as it has not been superseded by Louisiana case law or statute." *Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 787 F.3d 276, 281 (5th Cir. 2015) (per curiam). "We revisit those holdings only after a 'clearly contrary subsequent holding of the [state's] highest court,' a series of 'unanimous or near-unanimous holdings from several—preferably a majority—of [the state's] intermediate appellate courts,' or a 'squarely on point' statutory amendment." *PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 842 n.3 (5th Cir. 2023) (quoting *FDIC v. Abraham*, 137 F.3d 264, 269 (5th Cir. 1998)).

The Supreme Court of Louisiana has not explicitly decided whether plaintiffs in wrongful death suits can recover damages for both loss of love and mental anguish. One of its members has stated in a concurrence to a writ denial, however, that *Croce* does not "accurately reflect the law in Louisiana," and that "Plaintiffs are allowed to recover general damages for both 'loss of love and affection' as well as 'mental anguish, grief, and anxiety' as recognized by the courts below." *Breaux v. Goodyear Tire & Rubber Co.*, 2021-00811, p. 1 (La. 10/5/21), 325 So. 3d 363 (Mem.) (GRIFFIN, J.,

18

concurring) (citing *Hill v. Shelter Mut. Ins. Co.*, 2005-1783 (La. 7/10/06), 935 So. 2d 691, 695,[13] and *Rachal v. Brouillette*, 2012-794, p. 4 (La. App. 3 Cir. 3/13/13), 111 So. 3d 1137, 1143, *writ denied*, 2013-0690 (La. 5/3/13), 113 So. 3d 217 (Mem.)). The district court here relied on that concurrence.

"[A] writ denial by [the Supreme Court of Louisiana] has no precedential value[.]" *State v. Brown*, 2016-0998, p. 129 (La. 1/28/22), 347 So. 3d 745, 833. Nevertheless, in the 45 years since *Croce* was decided, Louisiana's Third, Fourth, and Fifth Circuits have allowed plaintiffs to recover separate damages for loss of love and mental anguish in wrongful death cases. *See Rachal*, 2012-794 at 4, 111 So. 3d at 1142–43 (explaining that loss of love and mental anguish are "distinct and separate injuries"); *Bryant v. Solomon*, 97-2008, p. 3 (La. App. 4 Cir. 3/25/98), 712 So. 2d 145, 147 ("The elements of a general damage award for wrongful death include loss of support and services, medical and funeral costs incurred and loss of love and affection. . . . [S]urvivors of the decedent may also be awarded damages for their mental pain, suffering and distress resulting from the death." (citations omitted)); *Levet v. Calais & Sons, Inc.*, 514 So. 2d 153, 157 (La. App. 5th Cir. 1987) ("[P]laintiffs were entitled to be compensated for the mental pain, suffering and distress, and loss of love, affection and companionship as a result of the death of their parents."). These opinions constitute "a series of 'unanimous or near-unanimous holdings from . . . a majority[] of [Louisiana's] intermediate appellate courts.'" *PHI Grp.*, 58 F.4th at 842 n.3. Notably, the reasoning behind *Croce*'s holding was based on the fact that no

---

[13] In *Hill*, the Louisiana Supreme Court acknowledged that Louisiana's appellate courts "have allowed damages in wrongful death actions for mental pain, suffering, and distress resulting from the death of the victim" as well as damages for "loss of love, affection, companionship, services, support, medical expenses and funeral expenses," but did not squarely address the question of duplicative wrongful death damages. *Hill*, 2005-1783 at 5, 935 So. 2d at 695.

caselaw existed to support granting separate awards for loss of love and mental anguish.

Because *Croce* is out of step with the weight of Louisiana's appellate courts, we are not bound by it. *See Abraham*, 137 F.3d at 268–69 ("[W]hen a panel is considering a governing question of state law on which a prior panel has ruled, the subsequent panel's obligation to follow that ruling is not alleviated by intervening decisions of intermediate state appellate courts *unless* such 'subsequent state court decisions . . . are *clearly contrary* to a previous decision of this court.'" (first emphasis added) (citation omitted)). The verdict form and accompanying jury instructions did not result in an impermissible double recovery under Louisiana law, and we find no abuse of discretion.

## C

Talos next argues that the district court erred in its application of the maximum recovery rule when ruling on its alternative motion for remittitur. It claims that the trial court correctly determined that Y.J.'s and Mrs. Jackson's general damages awards were excessive but failed to rely on factually similar cases. It seeks a second remittitur.[14]

To determine whether an award is excessive, courts generally compare it "with rulings in other factually similar cases decided under controlling law." *Marcel*, 11 F.3d at 568. Louisiana appellate courts consider "prior awards in similar cases, as well as the particular facts and circumstances of the case under review." *Pete v. Boland Marine & Mfg. Co., LLC*, 2023-00170, p. 10 (La. 10/20/23), 379 So. 3d 636, 644, *reh'g denied*, 2023-00170 (La. 12/7/23), 374 So. 3d 135. "Under the [maximum-recovery]

---

[14] Plaintiffs do not challenge the district court's initial findings of excessiveness.

rule, 'we remit damage awards that we find excessive to the maximum amount the jury could have awarded.'" *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 738 (5th Cir. 2011) (citation omitted). The maximum-recovery rule "permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision." *Echeverry*, 988 F.3d at 236 (quoting *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019)).

1

The jury awarded Y.J. $20,000,000 in general damages: $10,000,000 for loss of love, affection, and companionship, $5,000,000 for past mental anguish, and $5,000,000 for future mental anguish. After finding the award to be excessive, the district court determined that *Rachal v. Brouillette*, 2012-794, 111 So. 3d 1137, was factually similar and adjusted Y.J.'s award based on the $2,500,000 award affirmed by the appellate court.[15]

In *Rachal*, a young boy was awarded $2,500,000 in general damages for the wrongful death of his mother, and the award was affirmed on appeal. *Id.* at 6–8, 111 So. 3d at 1143–44. There, the survivor "enjoyed a close, loving relationship with his mother." *Id.* at 7, 111 So. 3d at 1143. "Although his parents were separated and [he] lived primarily with his father, he spent most weekends with his mother." *Id.* Evidence showed that his mother "was

---

[15] The district court adjusted $2,500,000 for inflation, bringing the award to $3,303,567.11, multiplied that by 150% under the maximum recovery rule, bringing the award to $4,955,350.67, and adjusted that to reflect the jury's allocation of fault of 88%, bringing the award to $4,360,708.59.

Talos contends that the district court's inflation calculation was incorrect because the court chose the wrong date from which to adjust the *Rachal* award for inflation. It argues the district court should have used the date of the appellate court's judgment in *Rachal* (March 2013) instead of the date of the jury's verdict (February 2012). Talos cites no legal authority to support this proposition, and it failed to raise this issue before the district court. This argument is forfeited. *See Rollins*, 8 F.4th at 397.

extremely involved in [his] life." *Id.* After his mother's death, the boy "suffered from hallucinations and suicidal thoughts and gained an extraordinary amount of weight." *Id.*

Here, Y.J. also enjoyed a close, loving relationship with his father despite the fact that they did not live together. At trial, Y.J. said Jackson was "a piece of [him] but the older version." The jury heard that Jackson was extremely involved in Y.J.'s life—the pair spoke almost every day, multiple times a day, and shared hobbies. As a result of Jackson's death, Y.J. changed, he became angry and sad, and he began seeing a therapist.

Because *Rachal* is factually similar, we find no abuse of discretion in the district court's application of the maximum recovery rule.

2

The jury awarded Mrs. Jackson $6,600,000 in general damages— $4,000,000 for loss of love, affection, and companionship, $1,500,000 for past mental anguish, and $1,100,000 for future mental anguish. The district court found that the award was excessive, applied the maximum recovery rule based on *Zimko v. Am. Cyanamid*, 2003-0658 (La. App. 4 Cir. 6/8/05), 905 So. 2d 465, and adjusted the award to $5,104,226.22.[16]

In *Zimko*, a widow was awarded $2,500,000 in general damages for the wrongful death of her husband of 31 years with whom she shared no children. *Zimko*, 2003-0658 at 1, 3, 905 So. 2d at 471, 474. Here, Mr. and Mrs. Jackson had been married three years and shared no children. When offshore, Jackson would call his wife at least three times a day, and the pair

---

[16] The district court adjusted $2,500,000 for inflation, bringing the award to $3,866,838.05, multiplied that by 150% under the maximum recovery rule, bringing the award to $5,800,257.07, and adjusted that to reflect the jury's allocation of fault of 88%, bringing the award to $5,104,226.22.

No. 23-30755

enjoyed traveling, attending church, and dining together. Jackson was a loving husband and Mrs. Jackson's best friend. Because *Zimko* offers no other facts regarding the plaintiff's marriage or emotional loss other than the length of the marriage, it appears to be factually dissimilar.

In comparison to awards in similar Louisiana cases,[17] the $2,500,000 award is disproportionately high. For example, in *Moore v. M/V ANGELA*, this court reduced an award for loss of consortium of $750,000 to $300,000 prior to adjusting the award for inflation and applying the multiplier. 353 F.3d 376, 385 (5th Cir. 2003). The plaintiff and the decedent had been together for seven years but had only been married for six months when the decedent passed away; they were approximately 50 years old when they married, had no children together, and "had a truly loving relationship." *Id.* at 384.

"We have discretion to set th[e] amount [for remittitur] or remand for the district court to do so." *Longoria*, 932 F.3d at 368. Talos suggests that "the better approach" would be for this court, not the district court, to determine the remittitur. "Having presided over the trial, [the district court] has greater familiarity with the evidence . . . from which to evaluate which

---

[17] *See, e.g.*, *Temple v. State ex rel. Dep't of Transp. & Dev.*, 2002-CA-1997, p. 15 (La. App. 1 Cir. 06/27/03), 858 So. 2d 569, 580 (awarding surviving spouse $75,000 where couple had been married one month, had no children together, and there was "no evidence of an unusually traumatic or extended reaction" to husband's death (emphasis omitted)); *Jeffries v. Est. of Pruitt,* 598 So. 2d 379, 387 (La. App. 1st. Cir. 1992) (affirming surviving spouse's $30,000 award for loss of love and affection, but recognizing award was "at the low end of the reasonable range of awards," where couple had been married for two years, lived together over a year prior to the marriage, and no children together); *Dotson v. Matthews*, 480 So. 2d 860, 867–68 (La. App. 2d Cir. 1985), *writ denied*, 481 So. 2d 1336 (La. 1986) (awarding $150,000 in general damages to surviving spouse where couple had been married for five years and "[t]he family was close in every sense of the word"); *Cheatham v. City of New Orleans*, 378 So. 2d 369, 377–78 (La. 1979) (awarding $200,000 to surviving spouse where couple had been married for three-and-a-half years).

cases are comparable." *Id.* We therefore vacate Mrs. Jackson's general damages award and remand for redetermination of remittitur of the award.

### D

Talos argues that it is entitled to a new trial because the jury's verdict resulted from passion and prejudice. It claims that Plaintiffs' counsel made inflammatory and incendiary comments that improperly prejudiced the jury against it. The "inflammatory" comments fall into five buckets: (1) "branding" Talos as a convicted felon; (2) making "conscience-of-the-community" arguments; (3) "condemning" Talos for seeking advice of counsel; (4) accusing Talos of witness intimidation; and (5) accusing Talos of misrepresentation of evidence.

To determine if a new trial is warranted based on prejudicial statements, "the statements must be examined collectively and in the specific context of the trial at issue." *Clapper v. Am. Realty Invs., Inc.*, 95 F.4th 309, 314 (5th Cir. 2024) (per curiam). "If the 'tactics' used during trial, taken together, 'tarnish the badge of evenhandedness and fairness that normally marks our system of justice,' then a new trial is warranted," particularly when employed during closing arguments. *Id.* (citation omitted). We have "often affirmed the denial of a motion for new trial where sparse prejudicial remarks, viewed in the context of the entire trial, were unlikely to inflame the passions of the jury." *Id.* at 317.

### 1

First, Talos argues that the district court erroneously overruled its objection to Plaintiffs' line of questioning about Talos's felony conviction for

failure to issue a hot work permit, and that Plaintiffs repeatedly invoked its felony conviction during trial.[18]

Under Federal Rule of Evidence 404(b), evidence of a defendant's past crime or other similar act is generally inadmissible to prove his character but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b). Impeachment constitutes a "conceivable non-character purpose." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 785 (5th Cir. 2018). The admissibility of Rule 404(b) evidence "hinges on whether (1) it is relevant to an issue other than the defendant's character, and (2) it 'possess[es] probative value that is not substantially outweighed by its undue prejudice' under Federal Rule of Evidence 403." *United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015) (alteration in original) (citation omitted).

Whether Talos failed to issue a hot work permit was an important issue at trial. Talos's corporate representative testified that Talos issued a hot work permit that was blown into the Gulf of Mexico. Plaintiffs presented evidence that a hot work permit was never issued, and it was this failure that contributed to Jackson's death. Talos's felony conviction for a failure to issue hot work permits is relevant to show knowledge, lack of accident, or absence of mistake. *See* FED. R. EVID. 404(b). Nor is its probative value outweighed by undue prejudice. The felony conviction "was not a critical part of [Plaintiffs'] case and did not occupy a large part of the trial." *See United States v. Hollis*, No. 93-5589, 1994 WL 395092, at *2 (5th Cir. June 29, 1994)

---

[18] Contrary to Plaintiffs' assertions, Talos timely objected to this line of questioning. Accordingly, we review for an abuse of discretion. *Hidden Oaks*, 138 F.3d at 1049.

(per curiam). Plaintiffs presented evidence that Talos failed to mitigate several hazards, not just those associated with hot work. We find no abuse of discretion.

2

Talos argues that during opening and closing arguments, Plaintiffs' counsel made improper conscience-of-the-community arguments, including statements that "people are watching . . . what you[,] [the jury,] decide," and that the jury had the "power to right this wrong."

"A conscience-of-the-community argument is any 'impassioned and prejudicial plea[ ] intended to evoke a sense of community loyalty, duty and expectation.'" *Learmonth*, 631 F.3d at 732 (quoting *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1239 (5th Cir. 1985)). "Such an argument often invokes the parties' 'relative popular appeal, identities, or geographical locations' to prejudice the viewpoint of the jury against an out-of-state corporation." *Id.* (quoting *Guar. Serv. Corp. v. Am. Emps. Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990)).

Even if construed as conscience-of-the-community arguments, in light of the entire record, Talos has not shown that a new trial is warranted based on these two statements. As the district court noted, Plaintiffs' counsel did not use the word "punish" or mention how much Talos is worth. Nor is this a case where an attorney employed the "particularly indefensible tactic" of using closing arguments "to bring before the jury damaging facts not in evidence and never established." *See Edwards v. Sears, Roebuck &. Co.*, 512 F.2d 276, 284 (5th Cir. 1975).

3

In its remaining points of error, Talos argues that Plaintiffs' counsel directed the jury to "infer something sinister" from its line of questioning

regarding its decision to put a lawyer on its investigation team instead of DLS's corporate representative. Talos also contends that Plaintiffs' counsel baselessly accused it of witness intimidation by inquiring into whether oil companies blame subcontractors when something goes wrong on a platform or prevent them from acquiring future work. Lastly, it claims that Plaintiffs' counsel improperly accused it of misrepresenting evidence.

Talos failed to object to any of these lines of questioning, so we review for plain error. *See Alaniz v. Zamora-Quezada*, 591 F.3d 761, 776 (5th Cir. 2009). "Reversal is appropriate if the error is (1) plain, (2) affects the appellant's substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings. An error is 'plain' if it is clear or obvious." *Id.*

Critically, Talos does not articulate how its substantial rights or the fairness of the proceedings were affected. *See id.* We find no plain error.

* * *

The district court's judgment is AFFIRMED, except for the remittitur of Mrs. Jackson's general damages award. We VACATE the award and REMAND for remittitur of Mrs. Jackson's general damages award.